# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRANDY JENEE SMYTHE,        )
            )
       Plaintiff,        )
            )        Civil Action No. 12-01798
       v.        )
            )        Judge Nora Barry Fischer
CAROLYN W. COLVIN,        )
Commissioner of Social Security,        )
            )
       Defendant.        )

## MEMORANDUM OPINION

## I.     INTRODUCTION

Brandy Smythe ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of the final determination of the Commissioner of Social Security[1] ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383(f) ("Act"). This matter comes before the Court on cross motions for summary judgment. (Docket Nos. 8, 10). For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence. Accordingly, Defendant's Motion for Summary Judgment, (Docket No. 10), is GRANTED, and Plaintiff's Motion for Summary Judgment, (Docket No. 8), is DENIED.

---

[1]      Carolyn W. Colvin replaced Michael J. Astrue as the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin was substituted for Michael J. Astrue as the Defendant in this suit. (Docket No. 5). No further action needs to be taken to continue this suit by reason of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on August 13, 2010[2] alleging a disability onset beginning August 9, 2010. (R. at 188).[3] She claimed her inability to work full-time stemmed from an injury to her right shoulder and a condition of her left hand. (*Id.*). Both claims were denied on December 21, 2010. (R. at 97, 102, 162, and 166). Ten months later, Plaintiff submitted a written request for a hearing (R. at 110, 231), and amended her disability report to include updates on her right shoulder condition, more information about her left index finger, carpal tunnel syndrome, and anxiety disorder. (R. at 231-32).   On November 15, 2011, Plaintiff and a vocational expert appeared and testified at a hearing before the ALJ. (R. at 28). The ALJ later denied Plaintiff relief in a decision dated December 7, 2011. (Docket No. 1-2 at 2; R. at 13-23). Plaintiff then requested a review of the ALJ's decision by the Appeals Council, but this request was denied on November 5, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1-3).

Plaintiff filed her Complaint in this Court on December 10, 2012. (Docket No. 1-1). Defendant filed her Answer on February 15, 2013. (Docket No. 5). Cross motions for summary judgment followed along with accompanying Briefs in support. (Docket Nos. 8, 9, 10, and 11). Accordingly, the matter has been fully briefed, and is ready for disposition.

---

[2]    Originally there was a conflict in the record as to when Plaintiff first applied for disability benefits. According to the Disability Report and the SSA's Decision, Plaintiff applied August 13, 2010. (Docket Nos. 1-2, 11, R. at 184). However, in Plaintiff's Applications for SSI and DIB, the Record states she applied on September 10, 2010. (R. at 162). During the hearing Transcript, the ALJ conferred with Plaintiff's attorney and it was concluded that the application date was August 13, 2010. (R. at 31-32).
[3]    Citations to the Record, *hereinafter*, "R. at __".

## III.    FACTS

### A. General Background

Plaintiff was born November 1, 1970 and was 41 years old[4] the day of her hearing. (R. at 34). According to her September 17, 2010 Function Report, she lived in a mobile home with a roommate and her son (R. at 197), but on the date of her hearing she claimed she and her boyfriend were temporarily renting her boyfriend's sister's basement. (R. at 33-34). Her son was not living with her at that time. (R. at 35). She has a high school degree and completed two years of college education, with no other vocational training. (R. at 36, 189). Before claiming disability, she had worked as a janitor in a dentist's office from May 2009 until she was terminated for non-disability reasons on February 28, 2010. (R. at 37, 188, 208). Between September 2006 and February 2009, Plaintiff held various positions including prep cook at a restaurant, assistant manager at Quizno's, mail clerk at a missionary office, and secretary at a dairy farm. (R. at 37, 38, 208). Upon appeal to this Court, she reported she had been working for the Bilo Gas & Go in Zelienople, PA beginning in June 2012,[5] but could only work part time "due to disabilities." (Docket No. 1 at 2, 5).

Though Plaintiff listed a 1998 Volkswagen Golf automobile as her property in her initial application (R. at 163), at the time of the hearing she alleged she had an expired license and could not drive. (R. at 35-36). In her application, Plaintiff stated her daily activities consisted of household chores like preparing meals for her son and roommate before they went to work, and taking care of her various pets. (R. at 198-200). In her free time she enjoyed reading, writing, fishing, hiking, and camping, but noted that her condition challenged her ability to do these

---

[4]    Plaintiff is defined as a "Younger Person" under 20 C.F.R. §§ 404.1536, 416.963.
[5]    In Plaintiff's Motion filed in this Court on December 10, 2012, Plaintiff claimed she currently worked for Bilo Gas & Go. (Docket No. 1 at 2). It is unknown if she still currently works for Bilo Gas & Go or any other employer.

activities. (R. at 200). She reported that she spent time with family watching television during the week and shopping at flea markets with friends on the weekends. (*Id.*).

<u>B. Medical History</u>

In Plaintiff's September 10, 2010 Disability Report, she claimed that an injury to her right shoulder and a subsequent injury to her left index finger limited her ability to work. (R. at 188). On her appeal to the Social Security Administration ("SSA"), Plaintiff asked the SSA to consider changes to her right shoulder and left index finger conditions, as well as new physical and mental limitations including carpal tunnel syndrome and treatment for anxiety disorder. (R. at 231-32). Relative to her right shoulder injury, Plaintiff claimed that her shoulder was "completely worthless" for up to a day after physical therapy sessions. (R. at 231). She reported that between January 2011 and August 2011, she had been treated by five different doctors and began physical therapy. (R. at 238). As of August 24, 2011, Plaintiff's list of prescribed medication included Naproxen,[6] Zoloft,[7] Vicodin,[8] and Ambien.[9] (R. at 239).

*1. Plaintiff's Right Shoulder Injury*

Plaintiff alleges she injured her right shoulder on June 27, 2006 when she caught a heavy falling object while working at an Eat N' Park. (R. at 206). According to her application, this

---

[6]    Naproxen is used to relieve shoulder pain caused by bursitis (inflammation of a fluid-filled sac in the shoulder joint), tendinitis (inflammation of the tissue that connects muscle to bone), and pain from other causes. Naproxen is in a class of medications called nonsteroidal anti-inflammatory drugs (NSAIDs). MedlinePlus: A Service of the U.S. National Library of Medicine, <u>Naproxen</u>. *Available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (June 4, 2013).

[7]    Zoloft, also known as Sertraline, is used to treat depression, panic attacks, obsessive compulsive disorder, post-traumatic stress disorder, and social anxiety disorder. WebMD: Drugs and Medications, <u>Zoloft Oral</u>. *Available at* http://www.webmd.com/drugs/mono-8095-SERTRALINE+-+ORAL.aspx?drugid=35&drugname=zoloft+oral (June 5, 2013).

[8]    Vicodin is a combination medication used to relieve moderate to severe pain. It contains a narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen). WebMD: Drugs and Medications, <u>Vicodin</u>. *Available at* http://www.webmd.com/drugs/drug-3459-Vicodin+Oral.aspx?drugid=3459&drugname= Vicodin+Oral (June 5, 2013).

[9]    Ambien's active ingredient is Zolpidem which is used to treat sleep problems (insomnia). Zolpidem belongs to a class of drugs called sedative-hypnotics. This medication is usually limited to short treatment periods of one to two weeks or less. WebMD: Drugs and Medications, <u>Ambien</u>. *Available at* http://www.webmd.com/drugs/drug-9690-Ambien+Oral.aspx?drugid=9690&drugname=Ambien+Oral (June 5, 2013).

resulted in a worker's compensation claim, which settled, and her health insurance benefits subsequently ended. (R. at 44, 206, 263). Before the benefits ended, she saw an orthopedic specialist who performed an MRI and an x-ray,[10] and then participated in physical therapy. (R. at 263). She claimed she stopped treatment because she did not have health insurance and believed the physical therapy made the pain worse. (*Id.*). Thereafter, Plaintiff obtained health insurance in September 2010 through Medicaid and will be covered until March 31, 2014. (R. at 35, 44; Docket No. 1-2 at 7). According to the Record, Plaintiff repeatedly told doctors and physical therapists that when she was injured in 2006 she tore her rotator cuff[11] in her right shoulder. (R. at 280 and 399). However, subsequent multiple MRI results and surgery showed no tear. (R. at 276, 350, 352, 397).

After obtaining health insurance on September 2, 2010, Plaintiff saw her primary care physician, Dr. Thomas J. Stancik at Slippery Rock Family Medical Center. (R. at 263). Plaintiff complained to Dr. Stancik that when she was treated for her shoulder problems, her MRI showed no rotator cuff tear, but that in the several years since her injury her pain and range of motion had become much worse. (*Id.*). She denied any grip strength weakness during the examination. (*Id.*). After examining Plaintiff, Dr. Stancik recommended an MRI and prescribed Ultram[12] as needed to last until her next appointment.[13] (*Id.*). On September 21, 2010, Dr. Carol L. Seifert of Butler Memorial Hospital reported to Dr. Stancik that an MRI showed no evidence of a rotator cuff tear

---

[10]    The medical records from the 2006 worker's compensation claim and the results of these initial tests are not included in the Record before the Court. (R. at 43, 206, 263, 280, and 399). Hence, it is unclear from Plaintiff's allegations what doctors diagnosed her with what condition at that time.

[11]    The rotator cuff is made up of tendons from four muscles: the supraspinatus, infraspinatus, teres minor, and subscapularis. It connects the humerus (upper arm bone) to the scapula (shoulder blade). The rotator cuff can tear from degeneration from aging and past injuries such as sustained when catching a heavy falling object. Orthogate: The Gateway to the Orthopaedic Internet. Rotator Cuff Tears. *Available at* http://www.orthogate.org/patient-education/shoulder/rotator-cuff-tears.html (June 4, 2013).

[12]    Ultrum  is used to help relieve moderate to moderately severe pain.  It is the brand name for Tramadol. WebMD: Drugs and Medications, Ultrum. *Available at* http://www.webmd.com/drugs/drug-11276-Ultrum+Oral.aspx?drugid=11276&drugname=Ultrum+Oral (June 6, 2013).

[13]    Dr. Stancik noted that Plaintiff was already taking Naproxen for her shoulder pain at the time. (R. at 263).

and no significant joint effusion.[14] (R. at 276). Dr. Seifert's impression was that Plaintiff suffered from supraspinatus tendinopathy[15] and she recommended physical therapy three times a week for four weeks. (*Id.*).

Accordingly, Dr. Stancik referred Plaintiff to physical therapist Judith L. Gimble of Keystone Rehabilitation Systems. (R. at 280, 288). At her first appointment on September 28, 2010, Plaintiff told the physical therapist that she had a rotator cuff tear that was not significant enough for surgery. (R. at 280). At a later appointment, Gimble noted that Plaintiff responded "hypersensitive to discomfort" and planned to continue with the treatment plan. (R. at 283). However, less than a month later the physical therapist reported back to Dr. Stancik that Plaintiff had only been seen for three visits and stopped physical therapy because she stated that she had seen no change in her symptoms. (R. at 280). Gimble reported that Plaintiff had full range of motion and that she showed symptoms consistent with impingement syndrome,[16] chronic pain syndrome, and possibly symptom magnification. (R. at 283). Gimble noted that Plaintiff had a "magnified reaction to her discomfort." (*Id.*). She recommended that Plaintiff be referred to an orthopedist for further investigation as to the reason for her significant shoulder pain. (*Id.*).

---

[14]    Joint effusion, or joint swelling, occurs when there is an increase of fluid in tissues surrounding the joints. Joint swelling is common with different types of arthritis, infections, and injuries. WebMD, <u>Arthritis Health Center: Swollen Joints (Joint Effusion)</u>. *Available at* http://arthritis.webmd.com/swollen-joints-joint-effusion (June 4, 2013).

[15]    The supraspinatus is a tendon of the rotator cuff located in the shoulder. (*see supra* footnote 11). Tendinopathy is injury to the tendon which can cause pain and swelling, making it difficult to move the affected area. The condition can be caused by either repeated use over a long period of time or an injury. Supraspinatus tendonitis is usually associated with impingement syndrome. (*See contra* footnote 16). NYU Langone Medical Center, <u>Shoulder Tendinopathy</u>. *Available at* http://www.med.nyu.edu/content?ChunkID=22493 (June 6, 2013).

[16]    Impingement syndrome of the shoulder occurs when there is inflammation between the humerus bone and the tip of the shoulder (acromion). Between these bones lie the tendons of the rotator cuff and if the space between the bones becomes too narrow, it causes irritation to the tendons and the cuff becomes inflamed. Inflammation causes the tendons to swell, making the space for movement still smaller. Eventually, this space becomes too narrow for the tendons and every time they move, they are pinched between the bones. Symptoms include pain, weakness and loss of motion. Pain from any cause, such as an injury, may lead to weakness of the cuff. Pain is exacerbated by overhead or above-the-shoulder activities. A frequent complaint is night pain, often disturbing sleep. Cedars-Sinai: <u>Bursitis of the Shoulder</u>. *Available at* http://www.cedars-sinai.edu/Patients/Health-Conditions/Bursitis-of-the-Shoulder.aspx (June 5, 2013); *see* American Academy of Family Physicians, <u>Management of Shoulder Impingement and Rotator Cuff Tears</u>. *Available at* www.aafp.org/afp/1998/0215/p667.html (June 5, 2013).

About two weeks later, on October 21, 2010, Plaintiff met with orthopedic surgeon, Dr. Robert L. Waltrip, M.D. at Tri Rivers Surgical Associates, Inc. ("Tri Rivers") (R. at 292). Dr. Waltrip opined that Plaintiff's x-rays demonstrated a Type II acromion.[17] (*Id.*). His impression was that Plaintiff suffered from a right shoulder bursitis.[18] (*Id.*). Hence, he gave her a corticosteroid injection[19] to the subacromial space. (*Id.*). He also recommended that she complete home exercises and continue taking Naproxen. (*Id.*). If her symptoms did not improve in six to eight weeks, Dr. Waltrip noted she could require an MRI arthrogram.[20] (*Id.*).

A month later, Plaintiff returned to Tri Rivers and saw Dr. Edward D. Reidy, M.D. (R. at 298). After the examination, Dr. Reidy diagnosed Plaintiff with chronic right shoulder pain and recommended Naproxen twice a day. (R. at 299). He reported that he explained to Plaintiff that being consistent with physical therapy was essential for her to see some relief. (*Id.*). He discouraged the use of nonsteroidal anti-inflammatory drugs (NSAIDs)[21] for treatment of this condition. (*Id.*). He concluded that if the symptoms persisted, she should follow up with Dr. Waltrip and an MRI arthrogram may be appropriate. (*Id.*).

Dr. Reidy referred Plaintiff to Panther Physical Therapy, where she was seen by physical therapist Laurie Maietta on December 4, 2010. (R. at 308). Maietta recommended a treatment

---

[17]     Type I acromion is considered "normal" while Type II and Type II acromions are possible causes for shoulder impingement. Type II acromion occurs when points in the shoulder bones are more curved and downward dipping, resulting in compression of the tendons. American Family Physician, Management of Shoulder Impingement and Rotator Cuff Tears. *Available at* http://www.aafp.org/afp/1998/0215/p667.html (June 6, 2013).

[18]     Bursitis of the shoulder is also known as impingement syndrome. (*See supra* footnote 13).

[19]     Corticosteroid injections can decrease inflammation and improve function, thus permitting improved range of motion and facilitating rehabilitative and strengthening exercises. For impingement syndrome, treatment should begin with measures to reduce pain and inflammation, including activity modification and prescription pain medication. If this is not effective, some patients may benefit from a subacromial corticosteroid injection. MedScape, Shoulder Subacromial Injections. *Available at* http://emedicine.medscape.com/article/1592584-overview (June 5, 2013).

[20]     An MRI arthrogram is a test to obtain pictures of a joint after a dye is injected into it allowing doctors to see the tendons. An arthrogram is used to find the cause of ongoing, unexplained joint pain, swelling, or abnormal movement of the joint. It may be done alone, before, or as part of other tests, such as an MRI, and may be more useful than a regular X-ray because it shows the surface of soft tissues lining the joint as well as the bones. WebMD: Arthritis Health Center, Arthrogram (Joint X-Ray). *Available at* http://arthritis.webmd.com/arthrogram-joint-x-ray (June 6, 2013).

[21]     *See supra* footnote 5.

plan for Plaintiff which included gym strengthening, a home exercise program, and twelve treatment visits. (R. at 309). Initially, Maietta assessed Plaintiff's functional scale rating at 50% out of 100%, with 100% equaling the patient's perceived function immediately prior to onset of symptoms. (R. at 308). Her goal for Plaintiff was to have a functional scale rating of 90-95% in two to four weeks. (R. at 309). The Record indicates that Plaintiff was seen that same week on December 7, 2010 and reported no problem since her last visit. (R. at 311). Maietta assessed Plaintiff's symptoms to be improving, noting that she demonstrated an improved range of motion and planned to continue the present course. (*Id.*). However, the Record does not contain any other evidence indicating treatment at Panther Physical Therapy.

Plaintiff returned to Dr. Reidy on January 14, 2011 for continuing right shoulder pain. (R. at 357). She claimed that she had been more compliant with the physical therapy program and that her condition was improving. (*Id.*). At her follow up appointment in May 2011, Plaintiff asked Dr. Reidy if she could see Dr. Waltrip again. (R. at 356). When Dr. Waltrip saw Plaintiff on May 26, 2011, she claimed the previous October 2010 corticosteroid injection (*see* R. at 292) did not help, and that her shoulder pain had increased. (R. at 352). Plaintiff told Dr. Waltrip that she had had a rotator cuff tear years ago. (*Id.*). He recommended an MRI anthrogram to better assess her shoulder. (*Id.*). Plaintiff requested that he "disable her," but Dr. Waltrip refused to do so without a supporting diagnosis. (*Id.*). Dr. Waltrip reviewed her MRI arthrogram results with Plaintiff on June 20, 2011. (R. at 350). He told her the test came back "essentially normal," and Dr. Waltrip's impression was possible bursitis of the right shoulder.[22] (*Id.*). He noted that there was no significant bursitis seen on the MRI and that his plan was "mainly a diagnostic intervention to help see if she [had] bursitis as a cause of her symptoms." (*Id.*). The test also showed she did not have a rotator cuff tear. (*Id.*). He recommended she complete at-home

_____

[22]     *See supra* footnote 15.

physical therapy at her own tolerance and gave her a second corticosteroid injection. (R. at 351). He planned to follow up in four to six weeks. (R. at 350). There is no evidence, however, in the Record that the follow-up appointment with Dr. Waltrip occurred.

According to a September 21, 2011 medical report from Dr. Dean G. Sotereanos, M.D., Dr. Waltrip allegedly referred Plaintiff to Dr. Sotereanos.[23] (R. at 399). Plaintiff told Dr. Sotereanos that she had a torn rotator cuff on her MRI[24] even though Dr. Waltrip's conclusion was no tear. (R. at 350, 399). Dr. Sotereanos examined Plaintiff and concluded that her X-rays showed some acromioclavicular joint[25] arthritis. (R. at 400). Dr. Sotereanos' plan was to proceed with a right shoulder arthroscopy[26] with acromioplasty,[27] resection of the clavicle bone, and rotator cuff repair under general anesthesia. (*Id.*). He scheduled her for surgery at Allegheny General Hospital on October 20, 2011. (*Id.*). The Operative Report stated that a diagnostic arthroscopy indicated an intact, but frayed, rotator cuff. (R. at 397). She had a type II acromion, upon which the surgeons performed an arthroscopic acromioplasty converting the type II to a type I acromion.[28] (*Id.*).

At Plaintiff's post-operative examination on November 2, 2011, Dr. Sotereanos indicated that Plaintiff was doing well and that her incision was healing. (R. at 402). He diagnosed her

---

[23]    Based on the Record, it is unclear how Plaintiff transitioned from receiving treatment from Dr. Waltrip to undergoing surgery with Dr. Sotereanos. Although Dr. Sotereanos' records state that Plaintiff was referred to him by Dr. Waltrip, there is no other evidence in the Record of this referral. According to Dr. Sotereanos, Plaintiff told him that Dr. Waltrip could not perform the surgery on the Plaintiff because of "technical difficulties." (R. at 400). However, none of Dr. Waltrip's records show this referral, and the ALJ's opinion claims that Plaintiff referred herself. (Docket No. 11 at 8).

[24]    Dr. Sotereanos' noted that Plaintiff did not bring the MRI results with her to the appointment. (R. at 399).

[25]    The acromioclavicular joint ( "AC joint") is the joint containing the acromion ("the point of the shoulder") and clavicle bones of the shoulder. STEDMAN'S MEDICAL DICTIONARY 19 (28th ed. 2006).

[26]    Arthroscopy is the endoscopic examination of the interior of a joint. STEDMAN'S MEDICAL DICTIONARY 19 (28th ed. 2006).

[27]    Acromioplasty is a surgical reshaping of the acromion, or the "point of the shoulder". It is frequently performed to remedy compression of the supraspinatus portion of the rotator cuff of the shoulder joint. STEDMAN'S MEDICAL DICTIONARY 19, 162 (28th ed. 2006).

[28]    *See supra* footnote 16.

with a right shoulder acromioclavicular joint[29] arthritis.[30] (*Id.*). He wrote her a new prescription for physical therapy three times a week for four weeks and a subsequent follow up. (*Id.*). Dr. Sotereanos stressed the importance of Plaintiff finding a physical therapist and following the treatment plan.[31] (*Id.*). By the date of her Administrative Hearing, three weeks after the surgery, Plaintiff testified the surgery had gone well and she was beginning physical therapy. (R. at 33).

### 2. Plaintiff's Carpal Tunnel Symptoms

In Plaintiff's January 14, 2011 appeal to the SSA, she alleged she was recently diagnosed with carpal tunnel syndrome in her right wrist.[32] (R. at 231). When Plaintiff returned to Dr. Reidy on January 14, 2011 for her right shoulder pain, she complained of numbness in her right hand which Dr. Reidy stated was "probably carpal tunnel syndrome."[33] (R. at 357). He offered to investigate the possible carpal tunnel syndrome with nerve conduction tests[34] but Plaintiff declined that option, so he provided her with a splint for nighttime use. (*Id.*). Plaintiff saw Dr. Reidy again in May 2011 and claimed that her wrist symptoms had worsened since her last visit. (R. at 356). A week later, Dr. Reidy conducted a physical exam and nerve conduction testing on both wrists to investigate the possibility of carpal tunnel syndrome. (R. at 354). The results

---

[29]    *See supra* footnote 24.

[30]    Arthritis is a condition characterized by loss of cartilage in the joint –essentially wear and tear of the cartilage, which allows the bones to move smoothly. Like arthritis at other joints in the body, arthritis of the AC joint is characterized by pain and swelling, especially with activity. Johns Hopkins Medicine: Orthopedic Surgery, Johns Hopkins Sports Medicine Patient Guide to "AC" Acromioclavicular Joint Problems. *Available at* http://www.hopkinsortho.org/ac_joint.html (June 7, 2013).

[31]    According to Dr. Sotereanos' report, Plaintiff had difficulty finding a therapist in her area. (R. at 402). This was the first time in the Record that Plaintiff showed any difficulty finding and/or traveling to a physical therapist.

[32]    Plaintiff alleges she was diagnosed with carpal tunnel syndrome in both wrists (R. at 41-42, 47, 232), but her medical records indicate that doctors never diagnosed her with carpal tunnel syndrome in either wrist; it was just noted by Dr. Reidy that Plaintiff "displayed carpal tunnel symptoms" in her right wrist, but not her left. (R. at 352-54).

[33]    Carpal tunnel syndrome is a condition caused by compression of a nerve where it passes through the wrist into the hand and is characterized especially by weakness, pain, and disturbances of sensation in the hand and fingers. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 188 (11th ed. 2007).

[34]    A nerve conduction test is done to detect damage to the nervous system. This test is often used to help detect nerve problems such as carpal tunnel syndrome. WebMD: Brain and Nervous System, Electromyogram (EMG) and Nerve Conduction Studies, *Available at* http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies (June 7, 2013).

showed borderline slowing of the median nerve across the right wrist consistent with carpal tunnel syndrome and no evidence of carpal tunnel syndrome of the left wrist. (*Id.*). Dr. Reidy referred her to Dr. Waltrip, who on May 26, 2011, stated that Plaintiff's right wrist "is to be treated conservatively for carpal tunnel syndrome at this point" and that her left wrist appeared to be normal. (R. at 352-54).

### 3. Plaintiff's Left Index Finger Injury

On December 21, 2009, Plaintiff accidentally dropped a propane tank on her left index finger.[35] (R. at 204, 253). She went to the emergency room at Grove City Medical Center where she was given an antibiotic but did not follow up with any other treatment due to "insurance reasons." (R. at 253). Specifically, Plaintiff testified because she did not have insurance, she was not able to afford treatment and her left finger never set correctly. (R. at 204). On January 18, 2010, Plaintiff presented with left index finger pain to Dr. David J. Dean, D.O. (R. at 253-55). After ordering an MRI, Dr. Dean prescribed Cipro[36] for one week to prevent infection, and noted that Plaintiff was "very concerned about the cost of treatment." (*Id.*). Upon follow up on February 3, 2010, Plaintiff's condition was considered "significantly resolved," and she was prescribed one more week of Cipro. (R. at 247-48).

At the Administrative hearing, Plaintiff testified that as a consequence of the propane tank accident her finger was broken in several places and the tip required stitches because it was nearly severed. (R. at 62-63). Plaintiff claimed that because she could not afford treatment for

---

[35] Plaintiff also injured her left toe in this accident. (R. at 51). Her medical records regarding treatment for her toe are included in the Record (R. at 341-49), but Plaintiff did not rely on same in her appeal. During her hearing, she testified that it was no longer an issue; thus the ALJ did not take this into consideration. (R. at 51). (She was treated by Dr. William E. Saar, D.O. of Tri Rivers and on August 11, 2011, he noted that "the overall alignment [of her left toe] is well maintained and acceptable." (R. at 341)).

[36] Ciprofloxacin ("Cipro") is used to treat or prevent certain infections caused by bacteria. MedLine Plus, Ciprofloxacin. *Available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688016.html. (June 10, 2013). Plaintiff's type of injury carried a risk of infection, if not treated. (R. at 255). It does not appear that Plaintiff developed any infection in her left index finger.

her injury, she now has nerve damage in her left index finger and she is unable to make a fist. *Id*. However, the latest MRI showed some minimal soft tissue changes, but no defects of the adjacent bones. (R. at 256).

### 4. Plaintiff's Mental Health Treatment

In her January 14, 2011 appeal, Plaintiff alleged that since her last Disability Report she had new mental limitations in her ability to work full time including nervousness, difficulty sleeping, and other symptoms of anxiety. (R. at 231-32). In early September of 2010, she initially complained of anxiety symptoms to Dr. Thomas J. Stancik because her son was about to enter the military. (R. at 263). She averred that she did not want treatment at that time for her anxiety because she wanted to take care of her right shoulder first. (*Id.*). Upon follow up for her shoulder, on January 13, 2011 Plaintiff told Dr. Stancik that her anxiety symptoms were getting worse because of her son's situation. (R. at 333). Plaintiff requested a Zoloft prescription and Dr. Stancik prescribed her 50mg of Zoloft. (*Id.*). On February 4, 2011, she claimed to have increased her dose by herself to 100mg and Dr. Stancik gave her a prescription for this amount. (*Id.*). On March 18, 2011, Plaintiff reported insomnia due to a worsening situation at home, so Dr. Stancik increased her dose to 150 mg.[37] (R. at 332). Plaintiff did not report any panic attacks or suicidal ideation during any of these appointments. (R. at 332-33).

Plaintiff saw therapist, Jenny Grossman of Glade Run Lutheran Services for six individual therapy sessions from September 7, 2011 to October 7, 2011. (R. at 379). At the time of her last appointment, Dr. Grossman noted that Plaintiff showed signs of depression but her

---

[37] Dr. Stancik also noted that Plaintiff was prescribed Ativan, but it is not clear in the Record when Plaintiff was prescribed this drug and by whom it was prescribed. (R. at 332). Ativan is a medication used to treat anxiety. WebMD: Drugs and Medications, <u>Ativan</u>. *Available at* http://www.webmd.com/drugs/drug-6685-Ativan+Oral.aspx?drugid=6685&drugname=Ativan+Oral (June 10, 2013).

overall progress had somewhat improved. (R. at 380). In addition, Dr. Grossman reported that Plaintiff had cancelled or missed six additional sessions during this treatment period. (R. at 379).

The Psychiatric Review Technique by the state agency review physician, Lisa Cannon, Psy.D., confirmed that Plaintiff suffered from anxiety, but the evaluation revealed no severe impairments. (R. at 313). Dr. Cannon found a mild limitation due to difficulties in maintaining concentration, persistence, or pace, but found that this limitation does not satisfy the functional criterion for disability. (R. at 323). Additionally, she reported that Plaintiff's statements were "only partially credible." (R. at 325).

C. Administrative Hearing

At Plaintiff's November 15, 2011 Administrative Hearing, Plaintiff and a vocational expert, Karen S. Krull,[38] appeared and testified before the ALJ. (R. at 28). Plaintiff was represented by Thomas A. Burkhart, Esquire. (R. at 28, 120-21). At her hearing, Plaintiff complained of right shoulder pain from her surgery (R. at 33), carpal tunnel in her left and right wrists (R. at 47), nerve damage to her left hand (R. at 47-48), issues sitting and walking for long periods of time (R. at 48), and anxiety and depression. (R. at 53).

Under examination by the ALJ, Plaintiff explained that because of her right shoulder injury, she is unable to perform daily tasks at home like cooking, cleaning, dressing herself, and taking care of herself hygienically. (R. at 40). When she first claimed disability, Plaintiff was able to complete the above mentioned activities to a limited basis. (R. at 41). She explained that she can no longer do these activities because her right shoulder pain became worse over time. (*Id.*). Daily chores such as putting away the dishes and reaching up to dress herself have become major problems, according to her testimony. (*Id.*). When the ALJ asked if she had to change

---

[38]     Karen S. Krull has been a self-employed vocational expert since 1987. According to her résumé, she has testified as a vocational expert for the SSA's Office of Hearings as well as in worker's compensation, personal injury, and other types of hearings. (R. at 150).

anything at home due to her condition, Plaintiff responded that she had to move her dishes to lower shelves, put a safety bar in her shower, and change her wardrobe so it is easier to dress herself. (R. at 57-58). Plaintiff had recently undergone surgery and discussed her post-operative examination and current condition. (R. at 33). She claimed that the surgery went well and she was beginning physical therapy the following week. (*Id.*). Plaintiff stated that her doctors reported her total recovery time should be between four and six months. (R. at 33, 45).

In addition to her right shoulder condition, Plaintiff reported that she has carpal tunnel syndrome, which causes her to have issues using her hands including "fine motor skill problems." (R. at 41).  When the ALJ asked if the issues were in one hand or both, Plaintiff explained that both hands have given her problems since she stopped working. (R. at 42-43). She also claimed that when she could type, after typing for about a half hour her hands became numb. (R. at 42). Plaintiff stated that she treats these symptoms at home by soaking her hands in warm water and wearing a brace at night. (*Id.*). According to her testimony, doctors did not pursue more aggressive treatment because "they decided to hold off on the carpal tunnel surgery until [her right shoulder] was taken care of." (R. at 42-43). Plaintiff further maintained that her doctors have not yet done testing to determine if she needs to have surgery on her wrists. (R. at 46). According to Plaintiff, the alleged symptoms prevent Plaintiff from doing repetitive motions with her hands or lifting more than a half-gallon of milk.   (R. at 64, 65, 70).

In addition to carpal tunnel syndrome, Plaintiff testified she has nerve damage in her left index finger from a previous injury that hinders her ability to use her left hand and to make a fist. (R. at 47, 59-63). She explained that when she dropped a propane tank on her finger, it nearly cut the tip off and broke the bone in three places. (R. at 62-63). She contended that she was unable to get proper treatment at the time, and the tendons in the hand "shortened." (R. at 62). Thus, she cannot make a fist or feel when she is holding something between her left pointer and thumb. (R.

at 62-63). She can, however, turn a doorknob and open a can of pop by using her middle finger. (R. at 59).

Regarding her anxiety and depression, Plaintiff explained that her symptoms include overall body aches and pains, headaches, mood swings, and oversleeping. (R. at 53). She told the ALJ that she recently switched medications because her Zoloft prescription was not helping with her symptoms. (*Id.*). Instead, she was taking Celexia[39] for depression and Xanax[40] for anxiety. (R. at 52). Because of her anxiety, Plaintiff explained that she had problems being around people. (R. at 53). She testified that she was too nervous to drive or to be in crowded areas like malls and grocery stores, and sometimes her therapist has her come through a back door so she will not be in the waiting room with other people. (R. at 54-55). Plaintiff stated that even if she was not communicating with people, just seeing them made her "jittery." (R. at 56). She acknowledged that medication helps her in situations like this, but she cannot shop by herself anymore. (R. at 56-57).

Plaintiff also described issues with her pelvis that were not included in her medical records. (R. at 48). She testified that she had a CAT scan which showed deformities in her pelvis and believed it was because she had children so close together. (*Id.*). Because of this condition, she cannot walk or sit for a very long time. (*Id.*). Plaintiff told the ALJ that she can only sit without shifting around about five to ten minutes at the most, but can sit for up to an hour before she has to stand up. (R. at 63). She claimed that standing was easier than walking, but that she could walk for up to a half hour. (R. at 64).

---

[39]     Celexia is an antidepressant medication used for the treatment of major depressive disorder. National Alliance of Mental Illness, Celexa. *Available at* http://www.nami.org/Content/ContentGroups/Helpline1/ Celexa_(citalopram).htm. (June 11, 2013).
[40]     Xanax, also known as Alprazolam, is used to treat anxiety and panic disorders. It acts on the central nervous system to produce a calming effect.    WebMD, Drugs and Medications: Xanax. *Available at* http://www.webmd.com/drugs/drug-9824-Xanax+Oral.aspx?drugid=9824&drugname=Xanax+Oral (June 11, 2013).

When discussing her daily activities, Plaintiff testified that she could cook for herself, but could not do chores like washing the dishes, sweeping, or mopping. (R. at 69). She stated that before her alleged disability onset, she was a writer for fun and was published online twice. (R. at 70, 74). She claimed she is unable to type but has a new program on her computer that types her dictation. (R. at 70-71). She stated that before her alleged disability, she could type about 55 to 60 words per minute and now she can only type 30 words per minute at the most. (R. at 75).

The ALJ also examined vocational expert, Karen S. Krull. (R. at 76, 153). When questioned about Plaintiff's work history, Krull testified that Plaintiff had worked as a waitress, which is classified as light and semiskilled, a janitor, which is classified as light and unskilled, a prep cook, which is medium and unskilled, an assistant manager, which is light and skilled, and a secretary, which is sedentary and skilled. (R. at 76). She claimed Plaintiff would be able to perform jobs she held in the past without having to bear weight with her arms. (R. at 77).

The ALJ then asked if a person of the Plaintiff's age, education, and past work experiences who is limited to light work and cannot use her arms for overhead and forward reaching, who is limited to only occasional gross and fine manipulation and who also has no use of the left non-dominant index finger would be able to return to Plaintiff's past work. (R. at 78). The vocational expert testified that such a person could not return to the claimant's past work, but could work as a greeter (which has 40,000 jobs in the national economy), information clerk (50,000 jobs in the national economy), or security guard (200,000 jobs in the national economy). (*Id.*). The ALJ then asked Krull if there were jobs in the national market where a person would not have to deal with the public, or face ten or more people at a time. (R. at 79). She claimed that all three of the jobs she listed: greeter, information clerk, and security guard would only require occasional contact with other people. (*Id.*). Upon examination by Plaintiff's attorney, Krull

testified that in addition to the discussed limitations, a person who could also not do repetitive motions with either hand would still be able to perform these jobs. (R. at 81).

### D. ALJ's Findings

The ALJ concluded that the Plaintiff did not have the functional capacity to perform any past work, but that she had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). (Docket No. 1-2 at 10, 14). In her decision, the ALJ determined that Plaintiff suffered severe impairment due to right shoulder tendonitis with entrapment and a general anxiety disorder. (Docket No. 1-2 at 7-8). Considering Plaintiff's testimony and medical records, the ALJ found that Plaintiff has the residual functional capacity to perform light work except that she has no use of her arms for overhead reaching and can only occasionally bend, stoop, crouch, crawl, kneel, and climb ramps and stairs, but never crawl or climb ladders, ropes, and scaffolds. (*Id.* at 10). She found that the Plaintiff cannot engage in repetitive motion of the right dominant hand. (*Id.*). The ALJ also limited Plaintiff to only occasional contact with the public. (*Id.*). Based on these findings, the ALJ ruled that the Plaintiff was not disabled as defined in the Act, and denied her claims for DIB and SSI. (*Id.* at 14, 15).

## IV.    STANDARD OF REVIEW

To be eligible for disability insurance benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment, which has lasted or can be expected to last for a continuous period of at least twelve months, or which can be expected to result in death. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). To determine whether a claimant has met the requirements for disability, the Commissioner must utilize a five-step sequential analysis in reviewing the claim. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x. 1; (4) whether the claimant's impairments prevent him or her from performing past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume past relevant work, the burden shifts to the Commissioner at Step Five to prove that, given the claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 26 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[41] 1383(c)(3);[42] *Schaudeck v. Comm'r Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind

---

[41]    Section 405(g) provides in pertinent part: "Any individual, after any final decision of the [Commissioner] made after a hearing to which he [or she] was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action… brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his [or her] principal place of business." 42 U.S.C. § 405(g).

[42]    Section 1383(c)(3) provides in pertinent part: "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

When considering an appeal, a district court cannot conduct a *de novo* review, nor re-weigh the evidence of record; the court can only judge the propriety of the ALJ's decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Mussi v. Astrue*, 744 F. Supp. 2d 390, 390 (W.D. Pa. 2010) (Cercone, J.); *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion… so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88 (2007).

## V.    DISCUSSION

Plaintiff's main points of contention with the ALJ's decision relate to her Residual Functional Capacity (RFC) finding and her credibility assessment. (Docket No. 9 at 7-10). Plaintiff advances three separate arguments:

- The RFC finding is not supported by substantial evidence.
- The vocational expert testimony cannot provide substantial evidence to support the denial.[43]

---

[43]    Plaintiff contends that the RFC finding was not supported by substantial evidence. (Docket No. 9 at 7). The Plaintiff additionally contends that the hypothetical question posed to the vocational expert was not supported by substantial evidence because it was based on the RFC. (Docket No. 9 at 7, 10). Because of the issues' relatedness, this Court will address the two issues as one. *Rutherford v. Barnhart*, 399 F. 3d 546, 554, n. 8 (3d Cir. 2005) (explaining that challenges to the adequacy of vocational expert testimony given in response to a hypothetical

- The credibility assessment is not supported by substantial evidence.

(*Id.*). The Commissioner counters that Plaintiff's claim of disability onset from physical limitations was not supported by the Record, and that Plaintiff's testimony was inconsistent with the Record. (Docket No. 11 at 6, 9). The Commissioner also maintains that Plaintiff's argument is without merit because she did not satisfy the burden of showing that she is disabled as defined in the Act. (*Id.* at 11).

When applying for SSA benefits, a claimant has the burden of producing evidence about his or her medical condition. *Bowen v. Yuckert*, 482 U.S. 137, 137 n. 5 (1987). Once evidence such as medical records have been provided by the claimant, if the record contains objective evidence of an impairment that could reasonably be expected to cause pain, the ALJ must give "serious consideration" to a claimant's subjective complaints of pain. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 2005). If the claimant does not provide medical records that establish an impairment that significantly limits the claimant's ability to do basic work activities, the ALJ can assume a claimant has no limitations until it is proven that one exists. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). In light of this authority and upon review of the Record, this Court finds that the ALJ adequately met her responsibilities under the law.

*A. Residual Functional Capacity (RFC) Report*

A claimant's residual functional capacity is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." 20 C.F.R. § 404.1525(a)(1); *see Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quotations omitted)). The Commissioner determines a claimant's residual functional capacity by performing a function-by-

---

question containing all limitations within the residual functional capacity assessment are essentially challenges to the RFC finding itself.).

function assessment of a claimant's ability to do work related activities. *See* S.S.R. 96–8, 1996 WL 374184, at *1 (holding that, in determining a claimant's residual functional capacity, the Commissioner "must first identify the individual's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis."); *see also* 20 C.F.R. §§ 404.1545, 416.945; *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 149 n.7 (3d Cir. 2007). In making this assessment, the Commissioner must consider all impairments, including those determined to be non-severe. 20 C.F.R. § 404.1545(a)(2). The Commissioner must also consider all of the evidence of record. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Doak*, 790 F.2d at 29 (3d Cir. 1986). The evidence of record includes all medical records, as well as "observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247 F.3d at 41.

Plaintiff first contends that the RFC finding is not supported by substantial evidence because the ALJ did not seek a functional opinion from any medical source regarding Plaintiff's ability to perform the functional demands of light work. (Docket No. 9 at 7-8). As discussed in *Bowen*, it is the claimant's burden to provide medical information to the ALJ regarding his or her physical limitations. 482 U.S. 137 at 146 n. 5. Based on the records provided by Plaintiff, the ALJ found that none of Plaintiff's treating physicians, orthopedic surgeons, or physical therapists set forth any physical limitation. (Docket No. 1-2 at 10). After reviewing the Record, this Court likewise found that none of the medical evidence provided any type of physical limitation that could prevent Plaintiff from working.[44] If Plaintiff does not provide sufficient medical evidence

---

[44] This Court acknowledges that in addition to medical records that do not document any physical limitation, when Plaintiff asked Dr. Waltrip to "disable her," he refused to do so. (R. at 352). This supports the ALJ's decision that "no subsequent evidence has been submitted that would [prove] that the claimant has...impairments severe enough to meet or equal a listing." (Docket No. 1-2 at 10).

to establish a limitation, the ALJ is not required to seek an outside medical opinion to prove that a limitation does or does not exist. 482 U.S. at 137; *Chandler*, 667 F.3d at 361. Accordingly, the ALJ appropriately based her decision on the medical records provided by Plaintiff and was not required to seek an outside medical opinion to asses her physical conditions.

The Plaintiff claims that the "ALJ did not have substantial evidence upon which to base [her] determination that Plaintiff is capable of the lifting and walking/standing requirements of light work; or the frequency with which she could engage in activities with her hands such as reaching and fingering." (Docket No. 9 at 9). Despite Plaintiff's claims, in this Court's estimation, the RFC finding was supported by substantial evidence. The RFC initially addressed Plaintiff's right shoulder condition. In doing so, the ALJ reviewed the medical records and concluded that she had a severe impairment in right shoulder tendonitis with entrapment but that this impairment did not preclude Plaintiff from performing any work. (Docket No. 1-2 at 7, 12). The ALJ looked to Dr. Waltrip's reports that Plaintiff's shoulder demonstrated "no gross abnormality" and had "overall good motion." (Docket No. 1-2 at 12; R. at 292). The decision relied on evidence that after Dr. Reidy ordered a physical therapy program, Plaintiff only went to two subsequent therapy sessions and reported no problems. (Docket No. 1-2 at 12; R. at 299, 311). Further, the ALJ explained that the most recent medical report from Dr. Sotereanos showed no evidence of permanent restrictions or limitations, confirmed by Plaintiff who later testified that her surgery had gone well. (Docket No. 1-2 at 12; R. at 33, 45, 402). Additionally, the ALJ noted that although medical records detail Plaintiff's history of right shoulder pain subsequent to a 2006 work injury, Plaintiff reported she continued to work until February of

2010.[45] (Docket No. 1-2 at 12; R. at 188). (The ALJ reasoned that "the fact that the [said] impairment did not prevent the claimant from working [in February of 2010] strongly suggests that it would not currently prevent work." (Docket No. 1-2 at 12)). Despite these generally positive medical evaluations and the fact that Plaintiff, herself, testified she should recover in four to six months (R. at 45), the ALJ's RFC finding limited Plaintiff to no use of both of her arms for overhead reaching. (Docket No. 1-2 at 10).

Next, as to Plaintiff's left hand ailments, the ALJ found that the "medical records regarding [Plaintiff's left index finger] revealed no significant or vocationally relevant limitations." (Docket No. 1-2 at 8). These records include an MRI showing some minimal soft tissue changes but no defects of the adjacent bones, and the most recent report from Dr. David G. Dean, which stated that Plaintiff's condition was "significantly resolved." (Docket No. 1-2 at 8; R. at 247-48, 256). The ALJ concluded that this was not a functional limitation as there was no evidence of nerve damage and no evidence of any treatment for this condition after February 2010, several months before Plaintiff's alleged date of disability onset. (Docket No. 1-2 at 8). Accordingly, this Court finds that the ALJ based her RFC findings regarding Plaintiff's right shoulder and left index finger on medical evidence provided by the Plaintiff, and appropriately used these records in supporting her decision. *Fargnoli*, 247 F.3d at 41.

Moreover, Plaintiff's dispute with the ALJ finding no evidence of carpal tunnel syndrome is unfounded. (Docket No. 9 at 7 n. 3). Plaintiff argues that "the ALJ erroneously stated that there is no evidence of carpal tunnel syndrome...because [the] EMG by Dr. Reidy on May 23, 2011 revealed [results] consistent with carpal tunnel syndrome." (*Id.*). In this exam, Dr. Reidy gave an impression, not a diagnosis, that the EMG showed results consistent with carpal tunnel

---

[45] While this information is irrelevant to the ALJ's December 2011 decision, the Court notes that in Plaintiff's Motion, she reported that she had been working for Bilo Gas & Go in Zelienople, PA, from June 2012 to the present. (Docket No. 1 at 2, 5).

in only her right wrist. (R. at 354). Three days later, Dr. Waltrip stated that Plaintiff's "left wrist is okay," and she is to be "treated conservatively." (R. at 353). Given same, the ALJ found the presence of this syndrome to be contested as there was a lack of a true diagnosis and contradictory evidence.[46] Even then the RFC excluded the claimant from repetitive motion of the right hand. (Docket No. 1-2 at 10). Regardless of Plaintiff's testimony about her carpal tunnel, which was inconsistent with the record, the vocational expert identified jobs existing in the national economy for a person who could not do repetitive motion of *both* the right dominant and left hands in addition to Plaintiff's other alleged limitations. (R. at 81). The ALJ's ultimate decision was consistent with the testimony of the vocational expert. Thus, remand is not required here because it would not affect the outcome of the case. *Rutherford v. Barnhart*, 399 F.3d 546 at 553 (3d Cir. 2005).

Last, Plaintiff cites to the ALJ's determination that "there is no opinion from a State agency medical consultant offering a physical [RFC] assessment." (Docket No. 9 at 8). She claims that "the ALJ [herself] acknowledged a gap" in regard to Plaintiff's ability to perform the functional demands of light work and "did nothing to fill it." (*Id*). However, this is a misreading of her decision as the ALJ did not acknowledge a gap, but instead pointed to the fact that Plaintiff *did not meet her burden of providing medical records showing an RFC limitation*. *Bowen*, 482 U.S. at 137 n. 5 (emphasis added). The ALJ went even further than is required and accommodated Plaintiff's assertions by "reduc[ing] the claimant's exertion to light work as well as including additional postural and manipulative limitations."[47] (Docket No. 1-2 at 13). As such,

---

[46] Plaintiff inferred during her testimony that she had carpal tunnel in both wrists (R. at 41-42). However, her medical records state that she did not have carpal tunnel in her left wrist and only had symptoms in the right wrist "consistent with carpal tunnel." (R. at 352-353). Of note, the vocational expert testified that there are jobs in the national economy that can accommodate Plaintiff's alleged carpal tunnel in both of her wrists. (R. at 81-82).

[47] In filling the gap created by Plaintiff's dearth of medical support, the ALJ even probed Plaintiff's comments alleging pelvic abnormalities that were not included in the medical record. (R. at 48, 63-64). (Plaintiff testified that she believed it was from bearing children so close together. (R. at 48)).

the ALJ considered Plaintiff's testimony of pain even when it was not supported by medical evidence. This Court finds the ALJ's decision is supported by substantial evidence. In sum, despite the arguments asserted by Plaintiff, this Court finds no reason to overturn the ALJ's decision.[48] *Orriols v. Comm'r of Soc. Sec.,* 228 F. App'x 219, 222 (3d Cir. 2007).

### B. Vocational Expert Testimony

Challenges to the hypothetical question posed to the vocational expert, if it was based on the RFC findings, are essentially challenges to the RFC finding itself. *Rutherford,* 399 F.3d at 554 n. 8. In her Motion, Plaintiff explains that because the hypothetical question posed to the vocational expert was based on the RFC, her challenge to the vocational expert's testimony is based on the same reasons as her challenge to the RFC. (Docket No. 9 at 10). To that end, as this Court has found the RFC finding is supported by substantial evidence, pursuant to *Rutherford*, this Court also finds that the vocational expert testimony provides substantial evidence to support the ALJ's decision. *Rutherford,* 399 F.3d at 554 n. 8 ("objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself.").

### C. Credibility Assessment

Regarding a claimant's credibility, the ALJ is required to "give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason,* 994 F.2d at 1067-68. If the ALJ determines that the complaints of pain are supported by medical evidence, the ALJ must "determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel,* 181 F.3d 358, 362 (3d Cir. 1999). These complaints of pain will be given "great weight" if they are supported by the evidence of the record. *Mason,* 994 F.2d at 1067–68.

---

[48]     The Court notes that as to Plaintiff's mental limitations, the RFC assessment also "include[d] some limitations in interactions with the public to reflect [Plaintiff's] non-severe anxiety in addition to her pain," which Plaintiff does not contest. (*Id*.).

However, the ALJ may reject Plaintiff's subjective complaints so long as the ALJ specifies his or her reasons for rejection and supports that conclusion by identifying conflicting evidence in the record. *Chandler*, 667 F.3d at 361-63. Under the applicable regulations, the ALJ may consider Plaintiff's daily activities as a valid factor when determining the reliability of the claimant's subjective complaints. 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ concluded that there were medically determinable impairments that could reasonably be expected to cause Plaintiff's alleged symptoms, but not to the intensity, persistence, and limiting extent that Plaintiff described. (Docket No. 1-2 at 11). She explained that Plaintiff's "subjective allegations were simply inconsistent with other evidence and the overall evidence did not persuasively establish excess pain or greater limitations." (*Id*. at 13). Plaintiff asserts that the ALJ's credibility assessment is not supported by substantial evidence and that she did not apply the appropriate legal standard. (Docket No. 9 at 9-10).

Plaintiff generally claims that "the ALJ appeared to base [her assessment] on the fact that [Plaintiff's] medical records did not explain why she was experiencing the symptoms she described." (Docket No. 9 at 9). Plaintiff cites *Reefer v. Barnhart* and explains that her demeanor at the hearing "could have shed additional light on her credibility." *Id*. at 9-10; 326 F.3d 376, 380 (3d Cir. 2003). This Court finds that the facts of this case are distinguished from *Reefer* and do not support Plaintiff's argument. In *Reefer*, the Third Circuit disagreed with an ALJ's credibility determination when a *pro se*[49] claimant testified about a stroke that was not included in the medical record. *Id*. at 380. The court in *Reefer* found that the ALJ did not ask sufficient questions about the stroke that would enable him to make a credibility assessment. *Id*. In our case, Plaintiff

---

[49] In *Reefer*, the Third Circuit opined that "[a]n ALJ owes a duty to a *pro se* claimant to help him or her develop the administrative record." 326 F.3d at 380. (citations omitted). Unlike *Reefer*, Plaintiff was adequately represented by Thomas A. Burkhart, Esquire. (R. at 28, 120-21). The hearing transcript also shows Mr. Burkhart took an active role in examining Plaintiff and the vocational expert. (R. at 71-75, 81-84).

does not contend she suffered from any medical condition that the ALJ did not fully address. (Docket No. 9 at 10-11). In her Motion, Plaintiff only refers to the ALJ's decision concerning Plaintiff's "purported ability to lift and/or carry only a half-gallon of milk, difficulty with hygiene...and inability to sweep or mop." (Docket No. 9 at 9).

Plaintiff explained her difficulty with lifting a half gallon of milk and mopping or sweeping stemmed from carpal tunnel in both wrists. (R. at 72-73). The *Reefer* court discussed that "upon finding that the medical records before [the ALJ] did not refer to this stroke, the ALJ had a duty to investigate further." 326 F.3d at 380. In Plaintiff's case, the ALJ not only looked to the medical records before her, but also investigated further at the hearing by asking numerous questions regarding Plaintiff's alleged carpal tunnel symptoms as well as other limitations. (R. at 41-43, 52-53, 59-61, 72-73). Unlike the situation in *Reefer*, when Plaintiff brought up issues not in the medical record, the hearing transcript shows a fully developed discussion of same. (R. at 48, 63-64). As Plaintiff cannot point to any condition not sufficiently addressed, this Court defers to the ALJ's credibility determination. *Reefer*, 326 F.3d at 380. (holding that reviewing courts "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.").

To the extent that Plaintiff continues to challenge the ALJ's credibility determination, the ALJ first focused her credibility discussion on Plaintiff's right shoulder condition as that was best documented by the medical record. (Docket No. 1-2 at 10-12); *Mason*, 994 F.2d at 1067-68. The ALJ discussed various doctors' reports of Plaintiff's conditions as well as her statements to those doctors. *Id*. Notably, while Plaintiff claimed severe limitations due to her right shoulder, the most recent post-operative examination with Dr. Sotereanos in November 2011 showed no evidence of permanent restrictions or limitations. (Docket No. 1-2 at 12; R. at 402). During that exam, Plaintiff reported to Dr. Sotereanos that "her pain is better than it was before surgery

already." (Docket No. 1-2 at 10; R. at 402). In addition, the ALJ pointed to Dr. Waltrip's earlier reports that showed Plaintiff's shoulder had "overall good motion" and was "grossly stable." (Docket No. 1-2 at 11; R. at 276, 292).

Moreover, the ALJ made her credibility determination on the basis of Plaintiff's left finger injury, which Plaintiff claimed limited her ability to use her left hand and make a fist. (Docket No. 1-2 at 8; R. at 47, 59-63). In contrast, the most recent medical report showed that "this condition was significantly resolved." (Docket No. 1-2 at 8; R. at 247-48, 256). The ALJ found that "there is no evidence of treatment for [the left index finger] after February 2010...several months before her alleged onset date of disability." (Docket No. 1-2 at 8). These two instances, among others, show that the ALJ used substantial evidence found in the medical records to support her credibility assessment of Plaintiff.

Even further, pursuant to 20 C.F.R. § 404.1529(c)(3), the ALJ considered Plaintiff's reported daily activities as a factor in assessing her credibility. (Docket No. 1-2 at 12; R. at 198). Plaintiff testified that she was unable to perform daily tasks like cooking, cleaning, dressing herself, and taking care of herself. (R. at 40). However, the ALJ noted Plaintiff reported in August 2011 that she was able to prepare meals, do the dishes and laundry, and liked to go fishing, camping, hiking and attending flea markets with friends. (Docket No. 1-2 at 12; R. at 198-200). The ALJ considered Plaintiff's testimony of her daily activities again when she found that even though Plaintiff said she could no longer type as well, yet she "was still able to type 30 words a minute." (Docket No. 1-2 at 12; R. at 75). Based on same, the ALJ appropriately used Plaintiff's reports of daily activities and inconsistencies therein to determine Plaintiff's credibility. *Rutherford*, 399 F.3d at 554.

The Court would also emphasize that regardless of the ALJ's credibility assessment, the RFC took into account all of the asserted ailments and the vocational expert's opinion testimony

that there are still jobs Plaintiff is capable of performing in the national economy even assuming Plaintiff's alleged conditions and limitations. (R. at 80-81). Plaintiff's contentions on appeal are thus inconsequential because the vocational expert's testimony included all of Plaintiff's limitations, giving her the benefit of the doubt. (Docket No. 1-2 at 13). As mentioned earlier, remand would not even be proper here "because it would not affect the outcome of the case." *Rutherford*, 399 F.3d at 553.

In sum, as required by *Mason* and *Rutherford*, the ALJ outlined many reasons for her credibility decision and relied on both the medical evidence and Plaintiff's testimony in arriving at same. 994 F.2d at 1067-68; 399 F.3d at 554; (Docket No. 1-2 at 10-12). Therefore, this Court finds that the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence and that the ALJ applied the appropriate legal standards in making her credibility determination.

## VI. CONCLUSION

Based upon the foregoing, this Court finds the decision of the ALJ is supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied; Defendant's Motion for Summary Judgment is granted; and, the decision of the ALJ is affirmed. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fisher
United States District Judge

Dated: July 2, 2013
Cc/ecf: All counsel of record.